THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. LOUIS VAN DUYNE, DEFENDANT-APPELLANT.

Argued October 6, 1964—Decided November 16, 1964.

370

*Mr. Heyman Zimel* argued the cause for defendant-appellant.

*Mr. Archibald Kreiger,* Assistant Prosecutor of Passaic County, argued the cause for plaintiff-respondent (*Mr. John G. Thevos,* Prosecutor of Passaic County, attorney).

The opinion of the court was delivered by
FRANCIS, J. Defendant Louis Van Duyne was tried in the Passaic County Court on an indictment charging him with

the murder of his wife Carol. The jury found him guilty of murder in the first degree and recommended life imprisonment. Following imposition of that sentence he appealed directly to this Court pursuant to *R. R.* 1:2–1(c).

A number of alleged trial errors are assigned as grounds for reversal. It is argued particularly that the charge of first degree murder should have been removed from the jury's consideration, and that in any event, a verdict of guilt in that degree was contrary to the weight of the evidence. These contentions necessitate an outline of the circumstances attending the fatal incident.

Van Duyne and his wife were married on October 15, 1956. He was 20 years of age and she about 18 years at the time. Their married life, during which two children were born to them, was a stormy one, marred by a number of separations. It is plain from the record that he was not a steady worker. In fact, in June 1961 it was necessary for his wife to obtain a support order from the Juvenile and Domestic Relations Court. And the day before she met her death, she had filed a new support complaint against him. Moreover, less than six months after the wedding he was charged with assault and battery for striking her about the head, face and body and banging her head against a wall. He was fined as a disorderly person in the local municipal court. In October 1959 he was convicted of carrying a concealed weapon and spent some time in the Bordentown Reformatory.

The last separation of the couple occurred on April 5 or 6, 1963, less than two weeks before Carol's death. Van Duyne had not been working since March 27; as he put it, he "just did not report for work on that day." On April 9 Edward Foley, Carol's brother (a bachelor who lived with their mother), took him in until he could find a job and a place to stay. He was still living there on April 18, the day of the homicide.

According to Foley, during the period between April 9 and 18, defendant said he was disgusted with his wife. He spoke in a threatening manner about her. He said he felt like

killing her; that some day he "would go down and beat her brains out"; if he ever started he "would not stop." He said also that some day he would "blow her brains out." Foley told him not to bother her, to leave her alone, and to support the children.

After the separation on April 5, Carol stayed with a Mrs. Mildred Gorman and her five children who occupied a lower floor of the apartment where she and defendant had been living. On April 18 at about 9:00 P. M., after patronizing a number of taverns, Van Duyne decided to visit his wife. When he arrived at the apartment Carol, Mrs. Gorman and her five children, Mrs. Frances Taylor, a friend of Mrs. Gorman, and her three children, were present. Van Duyne's attitude was friendly and after some conversation, he and Carol went into one of the bedrooms where they could have a private discussion.

About a half to three quarters of an hour later, Carol came out of the bedroom hastily and ran out of the house saying, "No, Millie, no," as she passed the room where Mrs. Gorman was standing. Defendant came out of the bedroom right after her and followed her out of the house. The fatal event took place very shortly thereafter.

The State's proof showed that defendant caught up to his wife on Grand Street, which intersects Mill Street, a short distance from the Gorman apartment. He took hold of her arms and held them in back of her. She was crying and he seemed to be pushing her. She fell on the sidewalk and he pulled her up. There was no blood on her face from this fall. One witness heard him say, "Come on home," to which she answered, "I can't," and he said, "Shut up before I kill you." He continued to "pull" her down Grand Street, around the corner onto Marshall Street, the next street, and then into an alleyway near the corner. This narrow alley is 452 feet from the Mill Street apartment.

One witness, an 11-year-old girl, who saw defendant pull his wife into the alley, followed them. On reaching the alley she saw the woman on the ground and the man kneeling or

bending over her "like choking her, like on the back of the neck." The young girl turned away, then returned for another look and saw the man still holding the woman whose face was bloody. Although the record is somewhat confused as to the exact sequence of events, apparently this witness cried out and attracted the attention of two young men in an adjoining building. They saw the defendant kneeling over a woman and asked what he was doing. They received a reply in vile language. Then he said, "Take a look for yourself," and started to run down the street. They pursued but lost him.

Within a few minutes after Van Duyne fled, he was apprehended in a telephone booth about a quarter of a mile from the alley. It developed that he was calling his brother-in-law Foley on the telephone. According to Foley, defendant had just said to him, "Well, it is too late now, babe." At this juncture, he heard another voice, obviously the police officer's, say, "Hang it up."

At the time of arrest defendant had blood on his hands. He wore a white T-shirt which had a massive bloodstain of the splatter type in the center. The chemist who examined his clothes said they showed considerable splashing of blood which indicated to him an impact had occurred and the blood had splashed. Even the trousers were fairly widely bloodstained; the lower left leg particularly showed both contact and splash stains. There was blood also at the right thigh and along the left side of the right leg.

The police were notified and appeared on the scene in a very short time. The assistant city physician of Paterson arrived also. He found the victim face down in a pool of blood and, after examination, pronounced her dead. He observed that her face was "pretty well battered in." There were bruises and lacerations on both sides of her face, her eyes were swollen and her jaw was dropped. The body was removed to the morgue where an autopsy was performed.

The doctor who performed the autopsy found blood over Mrs. Van Duyne's entire face and both arms from elbows to hands. There was dirt from the alley from her neck down and

over both lower extremities. She had a broken nose, broken upper jaw and her right eye was black with marked swelling. She had a one-half inch laceration above and on the outer side of the right eye, abrasions on the left forehead, both knees and right elbow. There were bruises and small scratch marks, probably fingernail marks, on her left wrist. The condition of the upper jaw, described as a fracture, was unusual. As explained by the doctor, the upper jaw had been detached or broken away from the skull. Considerable blunt force was required to produce that condition. Such force can be applied by a blow of a fist. (At this juncture it may be noted that Mrs. Van Duyne was 5 feet, two and one-half inches tall and weighed about 115 pounds. Defendant was 5 feet, 10 inches tall and weighed 170 pounds. Moreover, by occupation he had been a laborer doing heavy physical work.) The broken nose and detached jawbone caused a rupture of a substantial artery in the area which resulted in severe and fatal hemorrhages. On the happening of that type of sudden rupture, the blood would spatter and flow copiously. The autopsy revealed decedent had lost the major portion of her blood.

Defendant denied he had beaten his wife with his fists, or knocked her down or banged her head or face on the ground. He said he had sexual relations with her in the bedroom of Mrs. Gorman's apartment, after which he began to tease her about his association with another woman. She became upset and ran out of the house. He followed and caught up to her on Grand Street. He testified that as he approached her, he said he had been teasing her and there was no other woman. He put a hand on her shoulder but she kept moving, "mumbling" as she proceeded. Thereupon, he left her and went directly across the street. From that vantage point he watched her. She proceeded down the street "stumbling like" and then she fell. She got up and continued "in the same running condition" around the corner onto Marshall Street. As he watched, she fell again at the alleyway on Marshall Street. He recrossed the street and found her standing in the alleyway. He asked what was the matter and took hold of her,

"her face right on his chest." She said she was hurt and collapsed. She was bleeding profusely and he tried to comfort her. A young boy appeared and Van Duyne asked him to get an ambulance. Then he saw two men on a nearby porch and heard them "hollering and screaming." This made him "panicky" and he left not "to escape or get away," but "to get help." As he ran, he tried to "think of a phone" and ultimately remembered the one he was using to call his brother-in-law, Foley, when he was arrested.

The defense produced an ear, nose and throat specialist as an expert witness. He said a fracture detachment of the upper jaw from the skull could be caused by a person running into a wall or a fall on a flat, hard surface, or by a blow of a fist. He would not say, however, that such a result was reasonably probable in any one of the situations mentioned because of the amount of force ordinarily required to bring it about.

The assistant medical examiner of Essex County testified for the State in rebuttal. He had performed about 8,000 autopsies and had seen several hundred cases involving a fracture separation of the upper jaw from the skull. He said a considerable amount of force is required to produce such an injury, and he expressed the view that it would not result from a fall on a flat surface or a fall against a wall which occurred while the person was walking, staggering or running. A blow with a fist, however, applied directly to the nose, forceful enough to completely fracture the nose, could cause a detachment of the upper jaw.

I.

The validity of defendants grounds for reversal must be tested by the above evidence of criminality and the inferences which may be drawn reasonably from it. He maintains that at the close of the State's case the proof as to first degree murder was not sufficient to justify the trial court's denial of his motion to dismiss that aspect of the charge against him.

He claims the inadequacy remained unchanged after the defense evidence had been introduced, and so, when the motion was repeated at the end of the case, it should have been granted. And, finally, he says the jury finding of first degree murder was contrary to the weight of the evidence.

It has long been the law of New Jersey that on a motion for acquittal, whether made at the close of the State's proof or at the end of the entire case, the evidence and the inferences reasonably to be drawn from it must be viewed favorably to the prosecution. If upon such consideration a factual issue exists from which a reasonable jury could determine that defendant committed the crime charged against him, the motion to acquit must be denied. *State v. Loray*, 41 *N. J.* 131 (1963); *State v. Fiorello*, 36 *N. J.* 80, 86–91 (1961), *cert.* denied 368 *U. S.* 967, 82 *S. Ct.* 439, 7 *L. Ed.* 2d 396 (1962); *State v. Huff*, 14 *N. J.* 240, 249 (1954). Tested by that rule, clearly the trial court was correct in calling upon the jury to decide the problem of defendant's guilt of first degree murder.

More specifically, defendant asserts that evidence of premeditation, deliberation and willfulness, the components of first degree murder, is lacking. The thesis is that, at best, the State's proof showed a beating administered by the defendant's fists under circumstances insufficient to indicate the required intent to kill. The argument undervalues the probative force of the evidence. It is true that ordinarily fists are not considered lethal weapons, and therefore the State cannot benefit by the factual presumption of intent to kill which emanates from a killing by means of such a weapon. *Cf. State v. Bucanis*, 26 *N. J.* 45, 54 (1958); *Commonwealth v. Guida*, 298 *Pa.* 370, 148 *A.* 501 (*Sup. Ct.* 1930). But the necessary support for a finding of the three elements of first degree murder amply appears from other sources.

Defendant had previously beaten his wife. The record shows she was afraid to go out with him alone on the fatal night because he became nasty when he had been drinking. During the short period of their existing separation, he had

indicated he felt like killing her, that some day he would "beat her brains out," and, perhaps of even more ominous portent, that if he ever started, he would not stop.

When Mrs. Van Duyne ran out of the Gorman apartment, obviously she and defendant had had some disagreement. It is equally obvious from the State's proof that when he overtook her on Grand Street, his attitude was not conciliatory. He held one or both of her arms in back of her and seemed to be handling her roughly, in fact so much so that she fell. She was crying, said she could not go home with him and he told her to "shut up before I kill you." After pulling her to her feet, the two continued in the same fashion down the public sidewalk of Grand Street, away from the Gorman apartment. He did not strike her while they were in this open public view. But, when they reached the dark alleyway on Marshall Street, which obviously he was familiar with, the fatal event took place. The evidence is clearly susceptible of the inference that he pulled her into it and there administered the brutal beating which the doctors described. It supports the inference also that, as he had threatened, once he started, he never stopped until further blows made no difference. The condition of her face and head clearly evidences the vicious nature of the assault.

█ Thus the record contains ample evidence of defendant's homicidal disposition toward his wife. If the jury believed the evidence that as he walked down Grand Street and turned on Marshall Street in the direction of the alleyway he held her arm or arms in back of her and pushed or pulled her along, then his ugly attitude toward her was manifest. If he had not conceived the intent to kill her before he caught up with her on the street, there was ample time to conceive it and deliberate upon it in the legal sense before they reached the alleyway. No particular period of time need elapse between the formation of the purpose to kill and its execution. It is not necessary that premeditation and deliberation should continue for an hour or a minute. It is enough that the design to kill be fully conceived, deliberated upon and willfully exe-

cuted. *State v. Walker,* 37 *N. J.* 208, 218 (1962) ; *State v. Close,* 106 *N. J. L.* 321, 332 (*E. & A.* 1929).

On reaching the alleyway the opportunity to execute the intent to kill presented itself, and its execution began with the first blow this 5 foot, 10 inch, 170-pound physically strong man inflicted upon his 5 foot, two and one-half inch, 115-pound wife. Even if the design to kill was not conceived until they arrived at the alleyway, its conception at that point, followed by adequate deliberation upon it and the willful seizure of the opportunity thus presented to execute it, if found as the fact by the jury, would warrant a conviction of first degree murder. Moreover, the succession of blows, the patently vicious manner of their infliction, the enormity of the cruelty and the horrendous injuries suffered provide further evidence of a willful execution of an intent to kill. See *State v. Huff, supra* (14 *N. J.,* at *pp.* 246, 254) ; *People v. Jones,* 26 *Ill.* 2d 381, 186 *N. E.* 2d 246 (*Sup. Ct.* 1962) ; *Oliver v. State,* 234 *Ala.* 460, 175 *So.* 305 (*Sup. Ct.* 1937) ; *Commonwealth v. Guida, supra; State v. Hunt,* 134 *N. C.* 684, 47 *S. E.* 49 (*Sup. Ct.* 1904).

In our judgment the facts detailed above, without more, were adequate to create a factual issue for jury determination as to whether defendant was guilty of first degree murder. Furthermore, on the whole case, including the defendant's unconvincing denial of criminal participation in his wife's death, the evidence is most persuasive that the jury arrived at a just result. We see no basis on which it could be said their finding of guilt of first degree murder was contrary to the weight of the evidence.

## II.

Defendant contends that the trial court erroneously expressed the view during the direct examination of a defense medical expert that the law was not concerned with "possible" causes of the fractured upper jaw but only "reasonably probable" causes. We agree that it was proper for defendant to

prove on cross-examination of the State's physicians or on the direct examination of his own medical witnesses that there were possible causes of the jaw injury other than a blow of defendant's fist. On the whole record, however, we do not feel that the court's comment had any prejudicial effect on the ultimate consideration of guilt or innocence of the defendant.

The State had the burden of proving beyond a reasonable doubt that defendant administered a beating to his wife and that she died from it. There was no dispute at the trial that the extensive and fatal hemorrhage was produced by the fracture of the nose or upper jaw or both. It was the position of the prosecution that on the facts proved, the fracture of the jaw resulted from a blow or blows of defendant's fists. On the other hand, defendant contended the fracture could have come from a fall on a hard walk or against a wall. It is elementary that these possibilities were admissible not because the defendant had the burden of proving either possibility to be the fact, but rather to weaken the probative force of the proof adduced by the State in its effort to show beyond a reasonable doubt that an assault by the defendant caused the injuries and death. See *State v. Sturdivant,* 31 *N. J.* 165, 179–180 (1959).

In spite of the incorrect view expressed by the court, he did not exclude proof of the various possible causes of the jaw fracture. All of the medical witnesses, both for State and defense, used the word "could" in testifying as to causal relation between falls of the types described or a blow of a fist, and the injured jaw. Their answers were not stricken from the record. In order to weaken the force of their assertions, however, it was proper to interrogate them as to whether on the facts presented they would say that any one of the possible causes was the reasonably probable one. In fact, the only medical witness who was examined in the field of the reasonably probable cause of the fractured jaw expressed an inability to describe any one of the possible causes mentioned as the reasonably probable one.

In any event, the trial court in charging the jury made it perfectly plain that the defendant could not be found guilty

of first degree murder unless the State satisfied them beyond a reasonable doubt that the defendant, after premeditation and deliberation, administered a beating to his wife with intent to kill her and that she died as the result. Under the circumstances, we see no such prejudicial error in the criticized observations of the court, either during the questioning of the medical witness mentioned, or in the course of the prosecutor's summation, as would warrant a reversal of the conviction.

### III.

Defendant contends that the special jury panel to which he was entitled under *N. J. S.* 2A:74–9 was not provided, and therefore the conviction should be reversed.

This being a capital case, defendant was entitled to the services of a special jury panel under the cited statute. The names of 48 jurors were properly drawn from the general panel and the list of those persons was served on defendant as required. A deputy sheriff undertook to summon those listed. Forty-seven of the persons were served and appeared in court. Service was made on the wife of the 48th who informed the officer that she and her husband were leaving on vacation. She was instructed to have her husband write the court or appear and seek to be excused. The advice was not heeded, and on the opening day of the trial the prospective juror did not appear. His absence was noted by the court on the second day of the jury impaneling and the parties' attention was called to the fact. Defense counsel took the position that he had the unqualified right to a special panel of 48 jurors, and he insisted that full compliance with the statute was mandatory. He declined to waive the alleged defect but he made no motion for a mistrial, or a request for remedial action of any kind. The trial court felt the statute had been complied with sufficiently, and that defendant had suffered no prejudice, and the trial then proceeded in the customary fashion. When the special panel was exhausted,

the drawing of jurors continued in accordance with *N. J. S.* 2A:74–10. There is no suggestion that this procedure was not proper.

Defendant claims that *State v. Kociolek,* 23 *N. J.* 400 (1957) makes exact compliance with *N. J. S.* 2A:74–9 mandatory and anything less necessitates a new trial. But the force of *Kociolek* is misconceived. In that case the special panel was not drawn from the general panel but from a separate panel made up of 25% of the general panel. The irregularity was considered a departure from the essential elements of the legislative scheme established in the interest of procuring an impartial jury. See *State v. Sturdivant, supra* (31 *N. J.,* at *p.* 176).

The situation in the present case is different. The special panel of 48 jurors was drawn properly from the general panel and all 48 were summoned. Service of the summons on the wife of the juror who failed to appear at the trial was adequate. *N. J. S.* 2A:72–5; *State v. Martin,* 102 *N. J. L.* 388, 390 (*E. & A.* 1926). There is no doubt that after a proper panel of 48 persons is drawn, the court in his discretion, for adequate reason, may excuse some of them before trial. *Aaronson v. State,* 56 *N. J. L.* 9 (*Sup. Ct.* 1893). Obviously a person whose name appeared on the list might die after being summoned, or become so ill as to be unable to appear, or he might not be found by the deputy sheriff seeking to summon him, or even if served, he might not appear or be qualified to serve. *State v. Bectsa,* 71 *N. J. L.* 322 (*E. & A.* 1904). Such circumstances of themselves would not vitiate the special panel. See *State v. Martin, supra; State v. Martin,* 94 *N. J. L.* 139 (*E. & A.* 1919); *State v. Rosenthal,* 85 *N. J. L.* 564, 566 (*Sup. Ct.* 1914); *Patterson v. State,* 48 *N. J. L.* 381 (*Sup. Ct.* 1886). The possibility of such occurrences is the reason the Legislature, in rounding out the scheme for jury selection, provided that when the special panel or list of jurors shall be exhausted "from any cause" before a jury for the trial of the indictment is obtained, talesmen may be taken from the general panel. *N. J. S.* 2A:74–10.

█ It seems clear from the cases that where (as here) there was no departure from the basics of the statutory scheme for selection and use of the special panel, reversible error does not exist unless the circumstances show that defendant suffered prejudice. *State v. Sturdivant, supra* (31 *N. J.,* at *p.* 176). No prejudice is suggested in this instance, and we find none in the record.

## IV.

Defendant argues strenuously that his motions for mistrial should have been granted because of improper and prejudicial stories which appeared in local newspapers while the jury was being drawn.

In this case the State was seeking the death penalty for the defendant. Drawing of the jury began on October 7, 1963. At that time it was understood the jurors would not be sequestered until the full complement of 14 had been chosen and sworn. See *R. R.* 3 :7–2(f). On this first day one juror was accepted. He was allowed to go home when the court recessed.

On the morning of October 8, defense counsel reported to the court that a number of copies of the October 7 *Paterson Evening News* had been found in the jurors' assembly room at the end of the previous day's session. The special panel was not being kept in that room but obviously that panel would be exhausted soon and the general panel called into service.

The article said the "state is seeking the death sentence for the construction worker accused of brutally beating to death his estranged wife, Carol * * *." After referring to the wife's flight from the Gorman apartment with Van Duyne in pursuit, and the alleged beating in the alleyway, it continued:

"Van Duyne was nabbed in a phone booth by police a short time later. Police quoted him as saying, 'You've got me for murder. I don't desire to tell you anything.'"

In addition, counsel called attention to another article which appeared that morning in the *Paterson Morning Call.*

He suggested also that "at this moment" there were probably a dozen copies of the paper being read in the assembly room by members of the panel. The article was handed to the court. Among other things, it repeated the account of the *Paterson Evening News* including the portion quoted above, and in addition said:

"According to police, Van Duyne had been arrested at least 10 times and had once threatened to 'kill a cop.' Authorities reported after his arrest that Van Duyne beat up a man during the summer in 1962 and then threatened Detective William Toomey with a gun."

(It may be noted here that at no time during the trial were the facts appearing in this excerpt proved; the same is true for the statement attributed to Van Duyne set out in the *Evening News.*)

The newspaper articles were branded as prejudicial to the defendant's right to a fair trial and as warranting a mistrial. The trial court indicated his feeling that the statements were regrettable but on the record then before him, as not requiring the granting of the motion. He pointed out that the trial had just begun and only one juror selected and sworn. He would permit defense counsel to reopen the *voir dire* and examine that juror further as to whether he had read or heard about the newspaper stories and, if so, whether they had influenced him against the defendant. He ruled also that immediate sequestration of jurors as they were accepted would be ordered to eliminate any further contact with the press. In addition, he advised counsel he would permit a liberal examination of prospective jurors, as they were called, to ascertain if the articles had been read and would influence them in any way against the defendant. On this note the trial proceeded, and one more juror was accepted and sworn on that day.

On the following morning, October 9, before resumption of the proceedings, the defense attorney handed up to the court that morning's issue of the *Morning Call,* which again discussed the case. The motion for mistrial was renewed. The article did not repeat the improper references quoted above.

It referred, however, to the murder trial of the construction worker "accused of brutally beating his wife to death." The two jurors who had been accepted, of course, had not seen the paper because of the order of sequestration. As to the remainder of the panel, the court reiterated his intention to allow liberal questioning of the jurors as they were drawn as to their familiarity with the article and its influence on their thinking. He indicated that if the faintest inkling of prejudice appeared in the course of such questioning, he would excuse the juror on his own motion. A mistrial was denied, and on this day a third juror was accepted.

October 10 was devoted to a hearing as to the legality of the special panel, so the impaneling of the jury was suspended. On the morning of October 11 the motion for mistrial was renewed once more. The *Morning Call* of that day had written about the drawing of the jury and at the end of the article recited what was said to be the police report of the crime including the statement attributed to the defendant in the earlier papers, *i. e.*, "You've got me for murder. I don't desire to tell you anything." A mistrial was again refused, the court reiterating his earlier position as to liberal interrogation of the jurors as they were drawn.

In the subsequent questioning of prospective jurors it developed that some of them had read the articles in question. Those who indicated they had formed an opinion about the guilt of the defendant from such reading were excused. Others were accepted on swearing they were not prejudiced thereby and would decide the case solely on the evidence presented at the trial. Ultimately 14 jurors were chosen who swore they would decide the issue of defendant's guilt or innocence according to the evidence.

On this appeal defendant does not point to any facts or inferences appearing in the *voir dire* examination of the jurors respecting the unfavorable and unproved newspaper statements which would justify finding the trial court erred in accepting their disavowal of prejudice against the defendant. But he does express grave doubt that jurors who

are subjected to pretrial publicity seriously adverse to a defendant's interests can efface it altogether from their conscious and unconscious minds, no matter how hard they try to do so. The law must be sympathetic to that viewpoint, and must make the sympathy meaningful in a practical world of public trials. This can be done only by requiring trial judges to analyze and evaluate carefully the words, attitude and demeanor of the juror when he asserts an impartial mind and one which is free from prejudice regardless of the improper newspaper publicity. If, in spite of the disavowal, the trial court has any lingering doubt about the juror's capacity for impartiality, he should be excused from service. Moreover, since the demands of due process under the Federal Constitution, as well as *Article I, Paragraph* 10 of the New Jersey Constitution, require that the defendant in a criminal prosecution be given a fair trial by an impartial jury, an appellate tribunal is likewise under a duty to make an independent evaluation of the facts and circumstances and of the juror's *voir dire* examination. It should determine for itself whether the pretrial newspaper stories are so pervasive and so prejudicial, or the juror's protestation of unaffected impartiality after reading them so unconvincing or doubtful that a new trial should be ordered. *Cf. Irvin v. Dowd,* 366 *U. S.* 717, 81 *S. Ct.* 1639, 6 *L. Ed. 2d* 751 (1961); *Rideau v. Louisiana,* 373 *U. S.* 723, 83 *S. Ct.* 1417, 10 *L. Ed. 2d* 663 (1963); *Delaney v. United States,* 199 *F. 2d* 107, 113 (1 *Cir.* 1952); *Sheppard v. Maxwell,* 231 *F. Supp.* 37 (*S. D. Ohio* 1964); Annotation, 10 *L. Ed. 2d* 1243, 1270–1271 (1963); Note, "The Changing Approach to 'Trial by Newspaper,'" 38 *St. John's L. Rev.* 136 (1963); Note, "Constitutional Law: A Changing View Toward Trial by Newspaper," 16 *Okla. L. Rev.* 337 (1963). We have made an independent study of the record as presented to us by defendant for the purpose indicated and cannot find sufficient evidence that the newspaper articles of themselves prevented a fair trial or that they so infected the minds of some of the jurors as to leave them biased against the defendant.

Unfair and prejudicial newspaper stories and comment both
before and during trial of criminal cases are becoming more
and more prevalent throughout the country. In *Irvin v.
Dowd, supra,* a conviction of murder and a death sentence
were vacated because of a pretrial flood of information and
comment by newspapers, radio and television which the court
concluded deprived the defendant of a fair trial before an
impartial jury, even though each juror said he would be fair
in reaching a decision on the evidence presented. In a con-
curring opinion, Justice Frankfurter described the proceeding
as "a miscarriage of justice due to anticipatory trial by news-
papers instead of trial in court before a jury." His comment
on the contemporary scene deserves repetition:

"Not a Term passes without this Court being importuned to review
convictions, had in States throughout the country, in which sub-
stantial claims are made that a jury trial has been distorted because
of inflammatory newspaper accounts—too often, as in this case, with
the prosecutor's collaboration—exerting pressures upon potential jurors
before trial and even during the course of trial, thereby making it
extremely difficult, if not impossible, to secure a jury capable of taking
in, free of prepossessions, evidence submitted in open court. Indeed
such extraneous influences, in violation of the decencies guaranteed
by our Constitution, are sometimes so powerful that an accused is
forced, as a practical matter, to forego trial by jury. * * * For
one reason or another this Court does not undertake to review all
such envenomed state prosecutions. But, again and again, such dis-
regard of fundamental fairness is so flagant that the Court is com-
pelled, as it was only a week ago, to reverse a conviction in which
prejudicial newspaper intrusion has poisoned the outcome. * * *
This Court has not yet decided that the fair administration of criminal
justice must be subordinated to another safeguard of our constitu-
tional system—freedom of the press, properly conceived. The Court
has not yet decided that, while convictions must be reversed and mis-
carriages of justice result because the minds of jurors or potential
jurors were poisoned, the poisoner is constitutionally protected in
plying his trade." 366 *U. S.,* at *p.* 730, 81 *S. Ct.,* at *p.* 1646–1647

It is plain that reversal of convictions which are infected
by improper and prejudicial newspaper publicity, though
necessary to protect the right of a defendant to a fair trial,
no matter how heinous his crime would seem to be, is an expe-
dient and not a cure. Such reversals cast a heavy burden,
financial and otherwise, on the public and the defendant. For

example, in this case, even though the improper publicity has not resulted in a new trial, it imposed a substantial and otherwise unnecessary expense on the taxpayers of the County of Passaic. As has been indicated above, there was to be no sequestration of the jury until the full complement of 14 had been chosen. But, when the prejudicial matter appeared in the two local papers on successive days, the trial court felt obliged to abandon the plan and to order immediate sequestration as jurors were accepted. Impaneling of the jury took three weeks. Sequestration began on the second day of trial and after only one juror had been sworn. The cost to the public of maintaining the jurors during that long period before a single bit of evidence could be offered in support of the indictment was wholly unnecessary but for the newspaper articles.

Many curative measures have been proposed to curb improper crime reporting and trial of defendants by newspaper. Among them are greater use of the contempt power, legislation making it a criminal offense to divulge or publish prejudicial material pending a criminal trial, and the recognition of such pretrial publicity as a violation of the federal civil rights statute, on the ground that it deprives the defendant of a fair trial.[1] Comment on these suggestions is not required in the present case, except to note Justice Jackson's statement in *Craig v. Harney,* 331 *U. S.* 367, 394, 67 *S. Ct.* 1249, 1263, 91 *L. Ed.* 1546, 1561 (1947) :

"The right of the people to have a free press is a vital one, but so is the right to have a calm and fair trial free from outside pressures and influences. Every other right, including the right of a free press itself, may depend on the ability to get a judicial hearing as dispassionate and impartial as the weakness inherent in men will permit."

In the excerpt from Justice Frankfurter's opinion quoted earlier, he suggested that frequently the improper pretrial stories are published with the prosecutor's collaboration.

---

[1] Annotation, *supra* (10 *L. Ed.* 2d at *pp.* 1245, 1246) ; *St. John's L. Rev., supra,* at *p.* 149; 16 *Okla. L. Rev., supra,* at *pp.* 348–350; Lewis, "The Case of 'Trial by Press,' " N. Y. Times, § 6 (Magazine), *p.* 31 (October 18, 1964) ; Griswold, "When Newsmen Become Newsmakers," *Saturday Review, p.* 21 (October 24, 1964).

In our case such collaboration was not shown. But the news accounts suggest that the inflammatory factual material (which was never proved at the trial) was furnished by the police. If true, such conduct is censurable and worthy of discipline. Control of the matter is largely in the hands of the prosecutor and local police authorities. For example, one district attorney in New York State adopted an office rule prohibiting release of confessions to newspapers prior to trial. 131 *N. Y. L. J.* 4 (Apr. 22, 1954). In our view *Canons* 5 and 20 of the Canons of Professional Ethics require a broader and more stringent rule. We interpret these canons, particularly *Canon* 20, to ban statements to news media by prosecutors, assistant prosecutors and their lawyer staff members, as to alleged confessions or inculpatory admissions by the accused, or to the effect that the case is "open and shut" against the defendant, and the like, or with reference to the defendant's prior criminal record, either of convictions or arrests. Such statements have the capacity to interfere with a fair trial and cannot be countenanced. With respect to prosecutors' detectives and members of local police departments who are not members of the bar, statements of the type described are an improper interference with the due administration of criminal justice and constitute conduct unbecoming a police officer. As such they warrant discipline at the hands of the proper authorities.

The ban on statements by the prosecutor and his aides applies as well to defense counsel. The right of the State to a fair trial cannot be impeded or diluted by out-of-court assertions by him to news media on the subject of his client's innocence. The courtroom is the place to settle the issue and comments before or during the trial which have the capacity to influence potential or actual jurors to the possible prejudice of the State are impermissible.

There is nothing in the rules to which attention is now called which interferes with the operation of a free press. Trials of criminal indictments are public proceedings. Nothing is suggested herein which proscribes the reporting of the

evidence as it is introduced before the jury by the State and the defendant during the course of the trial.

An answer to problems such as are presented here must be achieved. Fair criminal prosecution and exercise of the guaranty of a free press are not incompatible with the constitutional right of a defendant to a fair trial by an impartial jury. Only the will to recognize and to subscribe responsibly to that fact has been lacking.

## V.

In summary, it may be said we have examined all of the charges of trial errors raised by defendant, and find no basis for reversal. Accordingly, the conviction is affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN—7.