229 N.J. Super. 102 (1988)
550 A.2d 1259
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
DAVID GARY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 31, 1988.
Decided December 1, 1988.
*105 Before Judges J.H. Coleman, Baime and D'Annunzio.
Janet L. Fayter, Designated Counsel, argued the cause for appellant (Alfred A. Slocum, Public Defender, attorney; Janet L. Fayter of counsel and on the brief).
Lisa Sarnoff Gochman, Deputy Attorney General, argued the cause for respondent (W. Cary Edwards, Attorney General of New Jersey, attorney; Lisa Sarnoff Gochman of counsel and on the brief).
The opinion of the court was delivered by COLEMAN, J.H., P.J.A.D.
A jury convicted defendant in 1975 of the murder of Thomas Quinlan, a priest and principal of St. James Grammar School in Penns Grove, contrary to N.J.S.A. 2A:113-1 and 2A:113-2, and assault with intent to kill a second-grade teacher in the same school, contrary to N.J.S.A. 2A:90-2. Defendant was sentenced to state prison for life. This is defendant's first appeal. We now affirm the judgment of conviction.
Because of the inordinate delay in prosecuting the appeal, a detailed procedural history is required. On February 28, 1975 a Salem County Grand Jury indicted defendant for murder and assault which occurred on February 24, 1975. Trial was conducted between July 24 and August 1, 1975. Defendant was sentenced on September 16, 1975. The notice of appeal was filed on November 3, 1975. Nearly two years later and before filing a merits brief, defendant's appellate counsel prepared a motion for a new trial in the Law Division, Salem County, based on alleged prejudicial pretrial publicity. The record does not indicate whether the motion was ever filed. In any event, no disposition of the motion has been located.
Defendant filed an appellate brief on April 12, 1978 and raised two issues: one, that the trial was infected by pretrial publicity; and two, that he was denied effective assistance of counsel. On April 20, 1978 a motion for a new trial was made *106 on behalf of defendant in the Appellate Division based on alleged prejudicial pretrial publicity. That motion was denied on May 10, 1978.
On January 3, 1979, the State moved to compel production of the transcripts of the jury voir dire and newspaper articles relied upon by defendant. On January 31, 1979 the State's motion was granted and defendant was directed to file and serve the transcripts and articles on or before February 9, 1979. The appeal was dismissed on March 21, 1979 for failure to comply with the January 31, 1979 order.
Defendant took no action to reinstate the appeal for more than six years. A motion to reinstate the appeal was finally filed on August 30, 1985. The motion was denied on September 24, 1985 without prejudice to renew the motion after filing the transcripts and the newspaper articles. On February 2, 1988 defendant again sought reinstatement of the appeal. This motion was granted on March 4, 1988. Defendant's merits brief was filed on March 10, 1988 and the State filed its merits brief on July 28, 1988. Neither the briefs nor oral argument enlightened us as to why defendant delayed reinstating his appeal. It is clear from the record, however, the present appellate counsel did not enter the case until approximately November 1987 and she is not responsible for the delay.
In this appeal, defendant contends:
1. THE EXTENT AND PREJUDICIAL NATURE OF PRETRIAL AND TRIAL PUBLICITY IN THE SALEM COUNTY AREA, PARTICULARLY WITH RESPECT TO DEFENDANT'S REPUTATION AND CHARACTER, WAS SUCH AS TO DENY THE DEFENDANT HIS RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY IN VIOLATION OF THE 6th AND 14th AMENDMENTS OF THE U.S. CONSTITUTION. (Not Raised Below).
2. THE EXTENT AND PREJUDICIAL NATURE OF THE PRETRIAL AND TRIAL PUBLICITY DENIED THE DEFENDANT HIS RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY IN VIOLATION OF ARTICLE I, PARAGRAPH 10 OF THE NEW JERSEY CONSTITUTION. (Not Raised Below).
3. DEFENSE COUNSEL'S FAILURE TO MOVE FOR A CHANGE OF VENUE OR OTHER PROTECTIVE MEASURES, COUPLED WITH OTHER SERIOUS MISTAKES MADE AT TRIAL, AMOUNTED TO MORE THAN *107 MERE TRIAL STRATEGY AND WAS, UNDER THE CIRCUMSTANCES OF THIS CASE, SUCH A FUNDAMENTAL AND GRIEVOUS ERROR AS TO DEPRIVE THE DEFENDANT OF EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE 6TH AND 14TH AMENDMENTS OF THE U.S. CONSTITUTION AND N.J. CONST., ART. I, PAR. 10.
4. THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT FAILED TO INSTRUCT THE JURY THAT DIMINISHED CAPACITY, WHILE NOT RISING TO THE LEVEL OF LEGAL INSANITY, NEVERTHELESS NEGATIVES THE CONCLUSION THAT FIRST DEGREE MURDER OR ASSAULT WITH INTENT TO KILL HAD BEEN COMMITTED. (Not Raised Below).

I
During the trial, defendant urged the defense of insanity under the M'Naghten rule at the time of the crimes. Because defendant concedes in this appeal that he shot the priest and the school teacher, the essential facts are not disputed. On the morning of February 24, 1975, defendant, armed with a shotgun, entered a second-grade classroom at St. James Grammar School in Penns Grove and opened fire at a teacher, K.T.F. The first shot struck K.T.F.'s right arm below the elbow and the impact spun her around. Defendant reloaded and fired again, striking the teacher in the abdomen and knocking her to the floor. Defendant again reloaded as Father Thomas Quinlan, the school's principal, approached the teacher's classroom. As he drew near, the priest asked, "What are you doing in this building?" Defendant fired a third shot that struck Father Quinlan in the head, killing him almost instantly.
Earlier in the day of the crimes, Evelyn Fulerton picked up defendant as he was hitchhiking in the rain. Defendant told Fulerton that he was heading for Carney's Point. At approximately 8:45 a.m., Fulerton dropped defendant off in Carney's Point and he walked across a field toward his uncle's service station at 307 Shell Road in Carney's Point. She did not notice anything unusual about defendant.
After defendant arrived at the station, he engaged in casual talk with his uncle, Newcomb Gary. He said "hello" to his cousin, Robert Gary, who was pumping gasoline. Defendant *108 went inside and began thumbing through a newspaper. Defendant and his cousin sat in silence until defendant suddenly said something to the effect that, "It's enough to piss you off." After 10 to 15 minutes, defendant said to his cousin as he was leaving, "I'll see you later." Neither his uncle nor his cousin noticed anything unusual about defendant that morning.
At approximately 9:00 a.m., Charles Dickey was driving north on Route 130 when he spotted defendant running while hitchhiking. Defendant appeared to be in a hurry. Dickey picked up defendant and drove him to Penns Grove.
Between 9:00 and 9:15 a.m., defendant kicked open the front door of his sister's apartment at 158 State Street, Penns Grove. Frederick Spinken, the boyfriend of defendant's sister Tina Reed, was inside the apartment at the time. When Spinken observed defendant at the closet, he asked defendant what he was doing. Defendant replied that he was looking for a shotgun. Defendant removed from the closet what appeared to be a shotgun. Spinken asked why he needed a shotgun, but defendant did not respond other than stating that he would find out.
When defendant left the apartment, Spinken did not follow him immediately. He did, however, follow in his car shortly thereafter. The last time Spinken saw defendant, he was heading toward State Street in the general direction of St. James Grammar School. Spinken did not call the police because defendant did not seem unusual, nasty, or quarrelsome and he was aware that defendant had a hunting license.
At approximately 9:10 a.m., defendant arrived at the door of K.T.F.'s second-grade classroom. After defendant shot K.T.F. twice, Naome Kellmyer, a first-grade teacher, left her class to investigate the noise. She saw defendant reload the gun. She retreated to her classroom and gathered the students into the cloakroom.
From her second floor classroom, Kellmyer saw Father Quinlan walk briskly down the hallway. She heard him ask, "What *109 are you doing in this building?" After defendant shot the priest, defendant walked down the hallway to a fire escape in the back of the school. Once outside the building, defendant ran through the school yard. Later, defendant was seen running along the railroad tracks.
August Klug, who witnessed defendant's escape, and Sgt. Lawrence Fisher of the Penns Grove Police Department, patrolled the area in a squad car. Klug spotted defendant running along a riverfront. When defendant observed the police car, he threw his gun into the air, and stated, "I'm done, I'm done." After defendant was handcuffed, he said "I'm sorry I did what I did, but I couldn't take anymore of this shit."
A search of defendant revealed four shotgun shells in his pocket. A live round was found in his gun. Subsequent police investigation uncovered three spent shells at the school and shotgun pellets imbedded in a desk in K.T.F.'s classroom. An autopsy revealed that Father Quinlan died from a shotgun blast to the skull.
As noted previously, defendant relied on the defense of insanity at the time of the shootings. At the trial Dr. Samuel Dinenberg, a neuropsychiatrist, testified on behalf of defendant. He examined defendant on February 28, 1975, which was four days after the shootings. Dr. Dinenberg testified that at the time of the shootings, defendant was legally insane in that he suffered from a mental disease that prevented him from comprehending the nature and quality of his acts. Dr. Dinenberg also testified that defendant was a paranoid schizophrenic who heard voices and saw men coming from under the door.
The State contended that although defendant was probably paranoid and schizophrenic on February 28, 1975, he was not legally insane at the time of the shootings. The State presented the testimony of Dr. Scott Sibert, a psychiatrist, to support the State's position. He examined defendant on July 7, 1975 and concluded that defendant's actions and deliberate conduct on February 24, 1975 indicated that he was not legally insane at *110 the time of the shootings. He found defendant suffered from "schizophrenia residual type," which is a disease of the mind. He testified that defendant's psychosis could have developed between the shootings and the time of Dr. Dinenberg's examination.
Dr. Howard Weinberg, a psychiatrist, examined defendant on March 27, 1975 on behalf of the State. He was called to testify by the defense when the trial judge ruled he was equally available to both sides. He presented evidence that was supportive of the defense in that he concluded defendant suffered from paranoid schizophrenia on the day of the shootings and on the day of his examination. Defendant aborted the examination and that prevented the doctor from formulating an opinion as to whether defendant was legally insane at the time of the shootings.

II
Defendant contends, as plain error, that the pretrial and trial publicity deprived him of a fair trial under the federal and state constitutions. Both the Sixth Amendment of the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution guarantee "to the criminally accused a fair trial by a panel of impartial, `indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 755 (1961); State v. Koedatich, 112 N.J. 225, 267 (1988). But a defendant is not entitled to jurors who are totally ignorant of the facts and issues involved in the case on trial. State v. Koedatich, supra, 112 N.J. at 268; State v. Sugar, 84 N.J. 1, 23 (1980). In addition, in a 1975 noncapital case in which it is alleged that a change of venue was required because pretrial publicity poisoned the jury against a defendant,
[t]he test is whether an impartial jury could be obtained from among the citizens of the county or whether they are so aroused that they would not be qualified to sit as a jury to try the case. The evidence submitted to be controlling must be clear and convincing proof that a fair and impartial trial cannot be had before a jury of the county where the indictment was found. [State v. Wise, 19 N.J. 59, 73-74 (1955)].
*111 A new and different standard was articulated in State v. Williams, 93 N.J. 39, 63 (1983), which was a capital case. The test under Williams is whether there exists a "realistic likelihood of prejudice resulting from pretrial publicity."
Courts place great weight on the jury voir dire in determining whether a jury's impartiality was compromised by the publicity. Patton v. Yount, 467 U.S. 1025, 1038-1039, 104 S.Ct. 2885 at 2892-2893, 81 L.Ed.2d 847, 858 (1984); State v. Jackson, 43 N.J. 148 (1964), cert. den. sub nom. Ravenell v. New Jersey, 379 U.S. 982, 85 S.Ct. 690, 13 L.Ed.2d 572 (1965). A trial court's determination after a thorough voir dire that publicity has not compromised the impartiality of a jury involves matters of credibility, judgment and discretion which should not ordinarily be disturbed on appeal. State v. Singletary, 80 N.J. 55, 63-64 (1979); State v. Jackson, supra, 43 N.J. at 160.
Our role in reviewing the voir dire is as follows:
[A]n appellate tribunal is likewise under a duty to make an independent evaluation of the facts and circumstances and of the juror's voir dire examination. It should determine for itself whether the pretrial newspaper stories are so pervasive and so prejudicial, or the juror's protestation of unaffected impartiality after reading them so unconvincing or doubtful that a new trial should be ordered. [State v. Van Duyne, 43 N.J. 369, 386 (1964), cert den., 380 U.S., 987, 85 S.Ct. 1359, 14 L.Ed.2d 279 (1964).]
We will therefore examine the newspaper articles and the jury voir dire to determine whether defendant was tried by an impartial jury.
It is true that in the days following the shootings, the Salem County area newspapers ran extensive coverage of the "murder." Generally, the stories detailed the factual events and profiled the victims and their assailant. Defendant was characterized as a former high school athletic standout  an "All American kid"  who inexplicably became violent in the last few years. The articles described him as despondent over his failed marriage and angered by his former wife's shielding from him of his six-year-old son. Defendant's propensity for barroom brawling was revealed, as well as his childhood nickname *112 "Tuffy" and the fact of a prior record. Some friends of the defendant were surprised by the shootings, while others said they were not surprised. Still other friends expressed an opinion that he was mentally ill.
Most of the coverage was factual in nature. However, on February 26, 1975, The Record described Father Quinlan's death as "... A Complete Needless Waste" in editorializing for stricter gun control measures and the need for government intervention to help identify and evaluate people whose behavior patterns deviate from the norm. The paper noted defendant's "increasingly anti-social behavior" and mentioned a previous incident, detailed in its pages about a year before, where the defendant allegedly backed his car into two men with whom he just had an altercation.
All but three of the articles contained in defendant's appendix were published between February 24 and March 2, 1975. Those three articles were published in Today's Sunbeam on July 24, 25 and 28, 1975. The July 24 article described some of the evidence the State intended to present. That evidence, for the most part, was presented during the trial. The July 25 and 28 articles simply described the ongoing jury selection process. Neither of these three articles was in the least inflammatory.
The jury selection began on July 24, 1975, which was approximately five months after the last alleged inflammatory or prejudicial article was published. Significantly, defense counsel did not request a change of venue, the use of a foreign jury, or that his peremptory challenges be increased. The jury selection lasted three days during which the trial judge interviewed 69 potential jurors. Of that number, 16 were excused because they were intimately connected with the case.
Fifty of the remaining 53 jurors professed that they had read or heard of the shootings. Although 34 jurors stated that they had discussed the case to some extent, only 13 of the 53 jurors questioned expressed an opinion as to the guilt of the defendant. One juror who stated she had been unaware of the case, *113 expressed an opinion of guilt in an obvious attempt to avoid jury duty. She was excused promptly for cause. Seven others indicated they could not lay aside their preconceptions of the defendant's guilt and were likewise excused for cause. One juror was excused because that juror expressed an opinion that the defendant was insane. Another who had expressed an opinion of guilt, but indicated he could lay it aside, was excused when he stated he would need to hear the legal definition of insanity before knowing if he would apply it. Three jurors who had originally expressed an opinion of guilt sat on the jury. Two indicated that they could lay their opinion aside; the other stated that an insanity defense would change her opinion.
All of the 14 jurors selected to sit on the case had prior knowledge of the shootings. Among that group, three were previously familiar with people connected to the case but indicated that their judgment would not be affected thereby. Marvin Bennett testified that he went to school 25 years earlier with Penns Grove police officer John Cooksey, a potential witness at the trial who was not called. John Gaynor knew county detective Jim McManus "to speak to," but he too was not called to testify. Walter Bond had previously sat on a case in which the trial prosecutor was the same as the prosecutor in this case. All 14 jurors selected, however, answered affirmatively to the following question:
Could you, if selected as a juror, decide this case fairly and impartially and solely and exclusively on the basis of the evidence that will be presented in Court and the charge of the Court?
Pervasive pretrial publicity does not necessarily preclude the likelihood of an impartial jury. State v. Koedatich, supra, 112 N.J. 225, 268; State v. Biegenwald, 106 N.J. 13, 35 (1987). Based on our careful study of the record, we are persuaded that the trial atmosphere was not so corrupted by the publicity that prejudice may be presumed. Such cases are rare indeed. See Sheppard v. Maxwell, 384 U.S. 333, 352, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600, 614 (1966); Estes v. Texas, 381 U.S. 532, 542-44, 85 S.Ct. 1628, 1632-34, 14 L.Ed.2d 543, 550-51 (1965); *114 Turner v. Louisiana, 379 U.S. 466, 472-73, 85 S.Ct. 546, 549-50, 13 L.Ed.2d 424, 429 (1965); Rideau v. Louisiana, 373 U.S. 723, 727, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663, 665-66 (1963); Marshall v. United States, 360 U.S. 310, 312-13, 79 S.Ct. 1171, 1172-73, 3 L.Ed.2d 1250, 1252 (1959). The extensive publicity in State v. Koedatich, supra, and State v. Biegenwald, supra, was insufficient to create a presumption of prejudice. We conclude, as did our Supreme Court in Biegenwald, that the jurors exposure to news accounts of how the shootings occurred or information as to defendant's prior criminal record and the community's high regard for Father Quinlan fail to create a presumption of prejudice.
Similarly, we are persuaded by our careful study of the jury voir dire, the articles and the totality of the circumstances that the publicity did not create a realistic likelihood of prejudice to the defendant at the time of trial. In arriving at this conclusion, we considered factors such as (1) the nature and extent of the coverage, (2) the size of the community, (3) the nature and gravity of the offense, and (4) the respective standings of the victims and the accused in the community. State v. Koedatich, supra, 112 N.J. at 271. Here, defendant and both victims were members of the same racial group. The victims and defendant were well known in the small community. The size of the community was not extremely significant in view of the fact that defendant did not contend that he did not commit the shootings. He asserted insanity as a legal defense. The trial judge conducted an extensive voir dire of potential jurors and found them qualified to sit on the case. We see no reason to disturb that finding. Even defense counsel said he was satisfied with the jury empaneled.
In addition, the articles contained largely factual material which was presented during the trial. Much of the content of the articles supported the insanity defense. Almost all of the pretrial publicity occurred in February 1985, more than five months before the trial commenced. The articles were not inflammatory. Defendant was depicted as a former athlete and *115 "tough guy" who apparently went berserk since no motive for the shootings could be determined. All of the jurors informed the court they could lay aside any opinion of guilt. The jury was reminded several times that the case had to be decided on the evidence presented during the trial. The trial was not conducted in a circus-like atmosphere.
It follows that if the pretrial publicity was not sufficiently egregious to create a presumption of prejudice or a realistic likelihood of prejudice under our posttrial decisional law, surely defendant has failed to establish through clear and convincing proof required by State v. Wise, supra, that the pretrial publicity deprived him of a fair and impartial jury trial. We therefore conclude that defendant's contention that he was denied a fair trial is unpersuasive.

III
Defendant also argues that he was deprived of effective assistance of counsel. This contention is based on defense counsel's failure to move for a change of venue, to seek a foreign jury or a continuance. Defendant further contends that he was prejudiced by trial counsel's failure to object to leading questions and by counsel's neglect in handling his chief witness. He also takes exception to counsel's failure to object to the admission of evidence bearing on his competency to stand trial and counsel's comments in his closing statement.
Under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 reh. den. 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984), defendant must demonstrate that trial counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. at 687, 104 S.Ct. at 2064. In State v. Fritz, 105 N.J. 42, 58 (1987), the New Jersey Supreme Court adopted the Strickland test to determine whether there has been a denial of effective assistance of counsel in state criminal proceedings. The Fritz court recognized that Strickland was not a drastic departure from existing state law. 105 N.J. at 53-58.
*116 Under the first prong of the Strickland and Fritz test the defendant must show that trial counsel's performance was deficient. Based on our careful study of the record, we are satisfied that the allegation of ineffective assistance of counsel is without merit. First, we have already concluded that the alleged failures associated with the jury selection process caused no prejudice to defendant. Second, trial strategy most often cannot be regarded as ineffective assistance of counsel following an adverse verdict. Strickland v. Washington, supra, 466 U.S. at 689-690, 104 S.Ct. at 2065-2066, 80 L.Ed.2d at 695; State v. Coruzzi, 189 N.J. Super. 273, 323 (App.Div.), certif. den. 94 N.J. 531 (1983). If the strategy backfires, a defendant may not be entitled to a reversal. In this case, trial counsel may well have decided that the pretrial publicity was not harmful given the defense of insanity. As a local athlete who excelled in three sports in a small community, it appears to be reasonable trial strategy to want a trial before a local jury. Furthermore, had a foreign jury been empaneled, defendant's peremptory challenges would have been reduced from 20 to 5. See R. 1:8-3(d) (1975).
Furthermore, the failure of counsel to object to many leading questions of witnesses as to defendant's demeanor on the morning of the shootings was undoubtedly because he regarded the answers as being supportive of the insanity defense. He confirmed as much when he incorporated a substantial portion of this information into the hypothetical question propounded by defense counsel to Dr. Dinenberg. Considering the trial as a whole, we are persuaded that under Strickland; Fritz; State v. Edge, 57 N.J. 580, 593 (1971); and State v. Coruzzi, supra, 189 N.J. Super. at 319-321, there was no denial of effective assistance of counsel.

IV
Finally, defendant argues that the trial judge sua sponte should have instructed the jury "that evidence of mental defect, *117 deficiency, trait, condition or illness may negative first degree murder and the intent necessary for assault with intent to kill."
As to the charge of assault with intent to kill, the judge told the jury "the State must prove defendant specifically intended to take the life of the victim." The jury was further instructed that
the defendant has interposed a defense of insanity to this defense [sic] as well as the defense of insanity to the homicide indictment. I will charge you with respect to the defense of insanity when I complete my charge to you on the homicide indictment because as you can well understand, the elements of the defense of insanity or what constitutes insanity is the same with respect to this indictment as it is to the other indictment.
As part of the court's charge on the defense of insanity, the jury was instructed that:
In considering whether defendant did, in fact, premeditate and deliberate, you should consider the evidence bearing upon his mental capacity to do so and if because of any mental defect, mental deficiency or mental weakness and the proof of any trait, condition or illness or any other cause or combination of causes, you conclude that he did not premeditate or deliberate, you cannot find him guilty of murder in the first degree; but you could find him guilty of murder in the second degree or manslaughter. If any of the mental operations did not occur, then the crime committed would not be murder in the first degree and your attention would then be directed to whether the defendant is guilty of murder in the second degree or manslaughter. If you conclude beyond a reasonable doubt that the killing was done by the defendant wilfully [sic], but so suddenly as to preclude premeditation or deliberation, then the killing would be reduced to murder in the second degree.
Although the court's charge of diminished capacity respecting the assault was not a paragon of clarity, State v. Masino, 94 N.J. 436, 447 (1983), when considered in the context of the charge as a whole, it allowed the jury a fair opportunity to consider diminished capacity as to the murder and the assault. State v. Wilbely, 63 N.J. 420, 422 (1973). See generally State v. Breakiron, 108 N.J. 591 (1987); State v. Conforti, 53 N.J. 239, 245-246 (1969) and State v. DiPaolo, 34 N.J. 279, 295 (1961), cert. den. 368 U.S. 880, 82 S.Ct. 130, 7 L.Ed.2d 80 (1961).
The jury rejected defendant's insanity defense and diminished capacity assertion specifically with respect to the murder. When it found defendant guilty of first degree murder, *118 it concluded that he had the mental capacity to commit a "willful, deliberate and premeditated killing." N.J.S.A. 2A:113-2. This means that defendant had the mental capacity and did in fact conceive of the design or plan to kill, that he deliberated on the plan in the sense of reconsidering and weighing the pros and cons of the plan or design to kill and finally he intentionally executed his design or plan to kill after deliberating upon it. State v. DiPaolo, supra. In so doing, the jury found he intended to kill the priest. By the same token, the jury concluded that defendant intended to kill the teacher when he shot her twice. In any event, any error in the charge was harmless beyond a reasonable doubt. R. 2:10-2; State v. Czachor, 82 N.J. 392, 402 (1980); State v. Melvin, 65 N.J. 1, 18 (1974).
We conclude that all contentions advanced by defendant are without merit. The judgment of conviction is affirmed.