[Civ. No. 31619.   Second Dist., Div. Three.   Aug. 18, 1967.]

COUNTY OF LOS ANGELES et al., Petitioners, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; EASON MONROE, Real Party in Interest.

Harold W. Kennedy, County Counsel, Robert C. Lynch, Assistant County Counsel, Mitchell L. Lathrop, Deputy County Counsel, Roger Arnebergh, City Attorney, Robert B. Burns and John A. Daly, Assistant City Attorneys for Petitioners.

Flint & Mackay, Edward L. Compton, Johnson & Johnson, George R. Johnson, Robert C. Lobdell, Gibson, Dunn & Crutcher, Robert S. Warren, Cummins, White & Breidenbach and Francis Breidenbach as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

A. L. Wirin, Fred Okrand and Laurence R. Sperber for Real Party in Interest.

McCOY, J. pro tem.*—The proceeding before us relates to an action pending in the respondent court entitled *Eason Monroe* v. *City of Los Angeles, et al., number 892044.* The

*Assigned by the Chairman of the Judicial Council.

defendants, the City of Los Angeles, its board of police commissioners and its chief of police, and the County of Los Angeles and its sheriff and its district attorney, here seek a writ of prohibition to restrain the respondent court from issuing a proposed preliminary injunction and from taking any further proceedings against them in that action. For convenience we refer to the petitioners as the defendants and to the real party in interest as the plaintiff. We have concluded that a writ of prohibition must issue as prayed.

Plaintiff commenced his action in August 1966. In his amended and supplemental complaint filed in November he alleges that he brings the action pursuant to section 526a of the Code of Civil Procedure,[1] to enjoin the illegal expenditure of public funds and property of the city and of the county. After identifying the several defendants he alleges that "Among the duties of the individual defendants, their deputies, subordinates and agents, is to accord, and to assure, to all persons accused of crime, their constitutional rights including the right to fair trial; and said officials have the duty not to make any statements to the press, which may result in depriving any accused of such right to fair trial."

In his first cause of action plaintiff alleges that in recent years deputies of the district attorney and of the sheriff and police officers while on public duty, "but beyond the scope, of their employment," have made out of court statements and provided, out of court, information to representatives of news media about persons who have just been arrested and about defendants facing trial in pending criminal cases, based on sources not open to the public or to the persons arrested or charged. Some of these statements and information were publicly printed and broadcast over radio and television. Eighteen "examples of such statements" as they appeared in newspapers are pleaded in *haec verba*, and others are set forth in exhibits to the amended complaint. It is also alleged that said law enforcement officers, upon the arrest of persons accused of crime have permitted the press to photograph for publication "evidence which the prosecution intended to offer

---

[1]Code of Civil Procedure, section 526a, reads in relevant part: "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the state, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein. . . ."

at the trial but which evidence had not yet been received at the trial, and to take photographs of defendants inside the police facilities.''

Plaintiff alleges that the making of such statements and the supplying of such information about persons who have been arrested to the mass communication media are in excess of said officers' authority, in that they violate the constitutional right of such persons to a fair trial, and their right to privacy, and that the time spent by such officers while making such statements while being paid public monies constitutes an illegal expenditure of public funds. Defendants have refused to comply with plaintiff's demand that they discontinue such practices.

It is then alleged that there is a lapse of time in the usual case of from one to three days before a person arrested is brought before a judge; that in the majority of cases the accused is not represented by counsel when he first appears before a judge and does not have funds with which to employ counsel; and that ''Prior to the making by law enforcement officers, as above set forth, of a statement pertaining to an accused at or about the time of his arrest, no court in Los Angeles County, other than this court of equity, acquires jurisdiction, or has the authority, to make appropriate orders, protecting the accused from statements by public officials abridging his right to a fair trial.'' The first cause of action concludes with the allegation that plaintiff has no plain, speedy or adequate remedy at law, and that he is entitled to relief under section 526a of the Code of Civil Procedure. The allegations of the remaining five causes of action do no more than set forth alternative theories for the granting of the relief plaintiff seeks.[2]

The prayer of the amended complaint as to all causes of action is that the defendants and their agents be enjoined from expending public funds by making statements and

[2] A second cause of action alleges that the police unlawfully give information to any person possessing ''a valid press identification card'' as to the police department records of any ''arrests, criminal charges and dispositions thereof of any persons'' as permitted by section 52.42.1 of the Los Angeles Municipal Code. The third cause of action alleges that this is an action brought in a representative capacity, on behalf of all persons ''who may be arrested and as to whom law enforcement officers'' may make statements which abridge their rights to a fair trial. The fourth cause of action alleges that injunctive relief is necessary to prevent a multiplicity of suits. The fifth and sixth causes of action are causes of action for declaratory relief.

furnishing information out of court concerning persons who have been arrested until the defendant appears in court and is represented by counsel or waives counsel, other than with respect to the identity of the defendant, the law under which he is charged, and the office in which a complaint or indictment has been filed, provided "that such injunction shall not be in effect if the defendant or his counsel makes any public statement pertaining to his case."

Upon the filing of the original complaint the court issued an order to show cause why a preliminary injunction should not be issued. The matter was heard on the demurrers to and motions to strike the amended and supplemental complaint and on the order to show cause. When the matter was heard the California Newspaper Publishers Association, several newspapers published in Los Angeles County, and a radio station in Los Angeles County and some of its news reporters and editors, herein sometimes referred to as "news media" appeared as amici curiae on behalf of defendants. It was stipulated by the plaintiff at the hearing that the only relief sought relates to the "pre-arraignment period," that is, "from the arrest of an accused until his arraignment."

In February 1967 the respondent court entered a minute order overruling defendants' demurrers and denying their motions to strike. In its minute order the court stated that unless otherwise commanded by a court of superior jurisdiction it would make an order granting a preliminary injunction in substance as set forth in paragraph VII of the minute order.

The proposed decree would until further order of the court enjoin "Defendants and each of them, their Officers, Agents, Employees and Agencies, engaged in the enforcement or administration of law and thereby the administration of Justice, and all persons having knowledge, actual or constructive, hereof and acting in concert with said Defendants or their said Officers, Agents, Employees and Agencies, . . . during and from the time of the arrest of an accused until his Arraignment (P.C. §§ 976, 978) upon the Accusatory Pleadings (P.C. § 691, par. 4) in any cause within the territorial jurisdiction of this Court, from, directly or indirectly, by any manner or means: I. Releasing or authorizing the release of any extra-judicial statements for dissemination by any means of public communication, relating to the alleged charge or the Accused and concerning: I (i) The prior criminal record (including arrests, indictments or other charges of crime), or the

character or reputation of the Accused, excepting only a factual statement of the Accused's name, age, residence, occupation, and family status, and if he has not been apprehended, may release any information reasonably necessary to aid in his apprehension or to warn the public of any probable danger he may present; or I (ii) The existence or contents of any confession, admission, or statement given by the Accused or his refusal or failure to make any statement; or I (iii) The performance of any examinations or tests, or the Accused's refusal or failure to submit to an examination or test; or I (iv) The identity, testimony, or credibility of prospective witnesses, excepting only the identity of the alleged victim; or I (v) The possibility of a plea of 'guilty' to the offense charged or a lesser offense; or I (vi) The Accused's guilt or innocence; or I (vii) Any other matters relating to the merits of or the evidence in the case, excepting only the arrest, including the time and place thereof, the identity of the investigating Officer or agency, and the length of the investigation and the nature, substance or text of the alleged charge, including a brief description of the offense charged, and may quote from or refer without comment to public records of the Court in the cause, the scheduling or result of any stage to and including said arraignment.'' By its proposed decree the court would retain jurisdiction to amend, modify or terminate the proposed preliminary injunction.

## The Issues

The basic question before us is whether the respondent court has jurisdiction to issue the proposed preliminary injunction and to take any further proceedings in the action. Defendants contend that in doing so the court would be acting without or in excess of its jurisdiction. If that is the case prohibition is the proper remedy to arrest the proceedings of the respondent court. (Code Civ. Proc., §§ 1102, 1103.)

■ It has been repeatedly held that ''in prohibition matters, as enunciated in *Abelleira* v. *District Court of Appeal* (1941) *supra,* 17 Cal.2d 280, 288, 291 [109 P.2d 942, 132 A.L.R. 715], the phrase 'lack of jurisdiction' may 'be applied to a case where, though the court has jurisdiction over the subject matter and the parties in the fundamental sense, it has no ''jurisdiction'' (or power) to act except in a particular manner, or to give certain kinds of relief or to act without the occurrence of certain procedural prerequisites. . . . Speaking generally, any acts which exceed the defined power of a court in any instance, whether that power be defined by

constitutional provisions, express statutory declaration, or rules developed by the courts and followed under the doctrine of *stare decisis,* are in excess of jurisdiction, in so far as that term is used to indicate that those acts may be restrained by prohibition or annulled on *certiorari.'* " (*City & County of San Francisco* v. *Superior Court,* 53 Cal.2d 236, 243-244 [1 Cal.Rptr. 158, 347 P.2d 294]; *Crittenden* v. *Superior Court,* 61 Cal.2d 565 [39 Cal.Rptr. 380, 393 P.2d 692].)

Within the framework of this rule we here consider whether, as contended by petitioners, the respondent court lacks jurisdiction over the subject matter and would exceed its defined powers by issuing the proposed injunction. As part and parcel of the solution of this problem, it is necessary to consider whether the plaintiff has capacity to maintain this action in the court below.

Petitioners further contend that even if the plaintiff has the necessary standing to maintain the action and the respondent court has the requisite jurisdiction, the proposed injunction would violate the constitutional guarantees of freedom of speech and freedom of the press. They also say that the proposed injunction would deprive the public of its constitutional right to information to which it is entitled. Amici curiae join in these contentions. Plaintiff meets these contentions with the argument that the proposed injunction is necessary to protect the constitutional rights of persons accused of crime to a speedy and public trial by an impartial jury, unprejudiced by any pretrial statements by the police, the sheriff and the prosecutor.

At this point some brief comments may be helpful to bring the issues before us into proper focus. We are not here concerned with the power of the magistrate or of the trial court to control the conduct and restrict or forbid the statements of public officials after an accusatory pleading has been filed. As we pointed out above, the proposed injunction would restrain them from making statements only during the prearraignment period.

There is no doubt that over the years the police, sheriff and the district attorney, among others have made statements and released information to the press and other news media with reference to accused persons during the prearraignment period of the kind sought to be prohibited by the proposed injunction. Broadly stated, our problem is to determine whether the making of any such statements concerning *all* persons who may be arrested in the future and the release of

such information can be enjoined by a court of equity because it may be established at the trial of some one or more of those persons that the making of such statements and their dissemination by the various news media constituted a clear and present danger to the right of such defendant or defendants to a fair trial. More narrowly, the question is whether such conduct is illegal within the meaning of section 526a of the Code of Civil Procedure.

### Plaintiff's Right
### To Maintain the Action

Defendants' contention that plaintiff lacks capacity to sue under section 526a of the Code of Civil Procedure is without merit.

Plaintiff alleges in his amended and supplemental complaint that he is a resident and taxpayer in Los Angeles County and that he brings this action pursuant to section 526a, Code of Civil Procedure, ''to enjoin the illegal use of public funds'' of the defendant county and city. We have no doubt that plaintiff is entitled to maintain such an action under the express provisions of that section against any officer or agent or other person acting in behalf of a county or of a city. (*Simpson* v. *City of Los Angeles,* 40 Cal.2d 271, 276 [253 P.2d 464]; *Wirin* v. *Parker,* 48 Cal.2d 890 [313 P.2d 844]; *Wirin* v. *Horrall,* 85 Cal.App.2d 497 [193 P.2d 470].)[3]

In support of their contention that plaintiff lacks capacity to sue under section 526a, defendants argue that that section cannot be used as a basis to enjoin acts which are not ''clearly illegal'' or as a basis for injunctive relief where more appropriate relief is available in a criminal action. This argument fails to distinguish between plaintiff's right to maintain his action and his ability to establish his right to the relief he seeks.[4] It is appropriate, however, in view of this argument, to comment briefly on the nature of a taxpayer's action under

---

[3]The case here is to be distinguished from those in which a taxpayer has the right to sue in a representative capacity. In such cases the taxpayer ''can bring a suit only in cases involving fraud, collusion, *ultra vires*, or a failure on the part of a governmental body to perform a duty specifically enjoined.'' (*Pratt* v. *Security Trust & Sav. Bank,* 15 Cal. App.2d 630, 636 [59 P.2d 862]; *Gogerty* v. *Coachella Valley Jr. College Dist.,* 57 Cal.2d 727, 730 [21 Cal.Rptr. 806, 371 P.2d 582]. But see *Wirin* v. *Horrall,* 85 Cal.App.2d 497, 504-505 [193 P.2d 470].)

[4]It is unnecessary to consider defendants' further contention that plaintiff lacks capacity to maintain the action under Code of Civil Procedure, section 526 since plaintiff does not here contend that he is entitled to relief under that section.

section 526a and on the showing which must be made by the plaintiff.

It is apparent from the decisions that in order to obtain injunctive relief in an action brought under section 526a, the taxpayer must establish that the expenditure of public funds which he seeks to enjoin is illegal. This point is sufficiently illustrated for our purposes by *Wirin* v. *Horrall, supra,* 85 Cal.App.2d 497, and *Wirin* v. *Parker, supra,* 48 Cal.2d 890. In *Wirin* v. *Horrall* the court reversed a judgment dismissing the complaint after a demurrer had been sustained without leave to amend. The complaint, as summarized by the court (pp. 504-505), alleged that "defendants (1) stopped automobiles and searched them and (2) stopped individuals and searched them, without having probable cause to believe that the automobiles contained contraband or that the individual citizens had violated any law." These acts, said the court, "were contrary to the provisions of the Fourth Amendment of the Constitution of the United States and article I, section 19 of the Constitution of the State of California, and therefore, since the acts were illegal, the searches and seizures were unreasonable and prohibited by the foregoing constitutional provisions. In view of these facts it is evident that defendants were wasting and unlawfully expending funds of the city of Los Angeles, and plaintiff as a taxpayer of such city had a right to have such illegal acts enjoined. The complaint stated a cause of action." The court there held that if defendants acted as alleged "their acts were unlawful and beyond the scope of their authority. Therefore they were illegally expending and wasting the public funds of the city of Los Angeles in (a) using the equipment of the police department of the city in illegal and unauthorized acts and (b) expending the time of the paid police officers of the city of Los Angeles in performing illegal and unauthorized acts. It is clear that if defendants acted as alleged, and we must for the purpose of this opinion assume they did, their acts were ultra vires."

In *Wirin* v. *Parker, supra,* 48 Cal.2d 890, 891, plaintiff, a citizen taxpayer, brought an action against defendant as Chief of Police of Los Angeles "to enjoin the alleged illegal expenditure of public funds to conduct police surveillance by means of concealed microphones." Reversing a judgment denying the relief sought, the court said it was clear from the findings of the trial court (pp. 893-894) "that defendant has authorized and directed dictograph surveillance in violation of the provisions of the United States Constitution (4th and

14th Amendments) and the California Constitution (art. I, § 19; *Irvine* v. *California,* 347 U.S. 128 [98 L.Ed. 561, 74 S.Ct. 381]; *People* v. *Cahan,* 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513]; *People* v. *Tarantino,* 45 Cal.2d 590 [290 P.2d 505]), and that as of July 2, 1952, he intended to continue so doing.''

With reference to plaintiff's right to maintain an action under section 526a the court further said in *Wirin* v. *Parker* (pp. 894-895): ''It is immaterial that the amount of the illegal expenditures is small or that the illegal procedures actually permit a saving of tax funds. [Citations.] It is elementary that public officials must themselves obey the law. It has been expressly held in this state that expediency cannot justify the denial of an injunction against the expenditure of public funds in violation of the constitutional guarantees here involved. (*Wirin* v. *Horrall, supra,* 85 Cal.App.2d 497, 504-506.) It bears emphasis that none of the arguments marshalled in *People* v. *Cahan, supra,* 44 Cal.2d 434, against the adoption of the exclusionary rule are here applicable. Plaintiff seeks to enforce directly the constitutional provisions to preclude the problem of the *Cahan* case. Indeed, the enforcement of the Fourth Amendment by contempt proceedings against overzealous officers was advocated as an alternative to the exclusionary rule by one of its ablest and severest critics (see 8 Wigmore on Evidence [3d ed.] § 2184, p. 40), and the dissenting opinion in the *Cahan* case stressed the arguments for a direct rather than indirect method of enforcing the constitutional guarantees that would not deprive ''society of its remedy against one lawbreaker because he has been pursued by another.'' ' (44 Cal.2d 434, 458.) ''

Here, too, plaintiff seeks to enforce directly a constitutional right, namely the right to a fair trial before impartial juries of all persons who may hereafter be arrested and brought to trial for the commission of some crime.

### The Effect of Prearraignment Publicity
### on the Right of Fair Trial

■ In the final analysis we are asked to hold that the release by the police, the sheriff or the prosecutor, during the prearraignment period, of all but a minimal amount of information relating to a person who has been arrested and to the charges against him[5] for dissemination by any means of

---

[5]The proposed decree would not prohibit the release of such information as the name, age, residence and occupation of the accused, and ''if

public communication is constitutionally prohibited and hence illegal because in *all* cases the release of such information for such dissemination will deprive the defendants of their constitutional right to a fair trial. This we cannot do.

We are concerned here with the effect of publicity during the prearraignment period on the constitutional right of the accused to a fair trial before an impartial jury. ''In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process *Re Oliver*, 333 U.S. 257 [92 L.Ed. 682, 68 S.Ct. 499] ; *Tumey* v. *Ohio*, 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437, 50 A.L.R. 1243]. 'A fair trial in a fair tribunal is a basic requirement of due process.' *Re Murchison*, 349 U.S. 133, 136 [99 L Ed. 942, 946, 75 S.Ct. 623].'' (*Irvin* v. *Dowd*, 366 U.S. 717 [6 L.Ed.2d 751, 81 S.Ct. 1639].)[6]

In seeking to resolve the issues before us we cannot be blind to the fact that in all too many cases overzealous police and prosecutors far exceed appropriate limits in their release of information to representatives of news media concerning persons under arrest. As we read the relevant decisions, however, it is still the rule that in most cases involving claims of deprivations of due process the courts must require an affirmative showing of identifiable prejudice to the accused as a demonstrable reality, even though in some particular case a procedure employed by the state may involve so great a probability that prejudice will result that it is deemed inherently lacking in due process. '(*Estes* v. *Texas*, 381 U.S. 532, 542-543 [14 L.Ed.2d 543. 550, 85 S.Ct 1628] ; *Sheppard* v. *Maxwell*, 384 U.S. 333, 352 [16 L.Ed.2d 600, 614, 86 S.Ct.

he has not been apprehended, . . . any information reasonably necessary to aid in his apprehension or to warn the public of any probable danger he may present.'' It also excepts the release of information as to ''the arrest, including the time and place thereof, the identity of the investigating and arresting Officer or agency, and the length of the investigation and the nature, substance or text of the alleged charge, including a brief description of the offense charged, and may quote from or refer without comment to public records of the Court in the cause, the scheduling or result of any stage to and including said arraignment.''

[6] We are well aware, of course, that procedures such as change of venue or sequestration of the jury do not always furnish wholly satisfactory remedies. (See *The Supreme Court, 1965 Term* (1966), 80 Harv. L. Rev. 125, 183-184; Trescher, *A Bar Association View* (1966), 11 Vill. L. Rev. 709, 710-712.) Moreover, as Justice Clark said in *Sheppard* (384 U.S. at p. 363, 16 L.Ed.2d at p. 620), ''we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception.''

1507].) Whether any accused person has been prejudiced by pretrial publicity emanating from the police or the prosecutor during the prearraignment period to the extent that he has been prevented from having a fair trial by an impartial jury necessarily depends on a careful examination of the facts of the particular case. No court can fairly determine in advance that such pretrial publicity will result in prejudice to the accused in *all* cases, no matter how much such publicity may be deplored.

*People* v. *Stroble*, 36 Cal.2d 615 [226 P.2d 330], is one of many recent cases which will illustrate the point.[7] The record in that case showed "that representatives of the People, prior to the trial, were guilty of flagrant misconduct." Defendant's claim that he was deprived of a fair trial "because the trial court did not protect him from, and the district attorney fostered, 'public pressure,'" was based on the fact that immediately following his arrest, instead of being taken before a magistrate, he was taken to the office of the district attorney where, without benefit of counsel or being advised of his constitutional rights, he was "interrogated, and confessed. The district attorney, even before defendant completed his statement, released to the press details of the statement (including defendant's admissions of sex play with his victim and other children on occasions prior to the killing) and also announced his belief that defendant was guilty and sane. At the time of defendant's arrest and at the time of his trial (which began some seven weeks later) there was notorious widespread public excitement, sensationally exploited by newspaper, radio and television, concerning crimes against children and defendant's crime in particular." The court affirmed Stroble's conviction because it did not appear that such misconduct, "however reprehensible . . . under the extraordinary circumstances of this case, . . . materially affected the regularity of defendant's trial and conviction." (*People* v. *Stroble*, 36 Cal.2d 615, 617-618, 620 [226 P.2d 330].)

The judgment in Stroble's case was affirmed in *Stroble* v. *California* (1951) 343 U.S. 181 [96 L.Ed.2d 872, 72 S.Ct.

---

[7]For extensive review of other cases see Annotation: Pretrial publicity in criminal case as affecting defendant's right to fair trial, 10 L.Ed.2d 1243-1306. Although this annotation is limited to federal cases, it includes those arising from criminal prosecutions in state courts as well as in federal courts. See also, Weclew; *Fair Trial—Equal in Value to Free Press*, 16 DePaul L. Rev. 353, 362.

599]. With reference to Stroble's claim that the newspaper accounts of his arrest and confession in the district attorney's office were so inflammatory as to make a fair trial in the Los Angeles area impossible, the question before the court was whether such newspaper accounts so "aroused such prejudice in the community that petitioner's trial was 'fatally infected' with an absence of 'that fundamental fairness essential to the very concept of justice.' *Lisenba* v. *California*, 314 U.S. 219 [86 L.Ed. 166, 62 S.Ct. 280]." (343 U.S. at pp. 191-192, 96 L Ed. at p. 881.) While the court deprecated the action of the district attorney in releasing to the press on the day of the arrest certain details of the confession which was read into evidence at the preliminary hearing four days later, the court said that petitioner "has not shown how the publication of a portion of that confession four days earlier prejudiced the jury in arriving at their verdict two months thereafter." (343 U.S. at p. 193, 96 L.Ed. at p. 882.) The court also declined to simply read the newspaper stories published at the time of the arrest and then declare "that they necessarily deprived him of due process. That we cannot do, at least where, as here, the inflammatory newspaper accounts appeared approximately six weeks before the beginning of petitioner's trial, and there is no affirmative showing that any community prejudice ever existed or in any way affected the deliberation of the jury." (343 U.S. at p. 195, 96 L.Ed. at p. 883.)

In *Irvin* v. *Dowd* (1961) 366 U.S. 717 [6 L.Ed.2d 751, 81 S.Ct. 1639], the court held that the petitioner had been deprived of his constitutional right to a fair trial by an impartial jury in a state prosecution for murder because of the clear and convincing "build-up of prejudice" in the community by intensive publicity through news media in the locality from the time of his arrest until the time of trial. Among other things this publicity, which continued to the time of trial, included press releases by police officials stating that petitioner had confessed to six murders which had been committed in the vicinity some months before his arrest, together with details of his background. "The headlines announced his police line-up identification, that he faced a lie detector test, had been placed at the scene of the crime and that the six murders were solved but petitioner refused to confess. Finally, they announced his confession to the six murders and the fact of his indictment for four of them," his offer to plead guilty if promised a 99-year sentence, and the

announced determination of the prosecutor to secure the death penalty. The court held that the judgment of conviction was void because of the cumulative effect of the publicity both before and after petitioner's arrest. It held, however, that " '[t]he affirmative of the issue [of prejudice] is upon the challenger.' '' (6 L.Ed.2d at pp. 757-758.)

*Rideau* v. *Louisiana,* 373 U.S. 723 [10 L.Ed.2d 663, 83 S.Ct. 1417], was decided in 1963. The record in that case showed that defendant was arrested a few hours after a man had robbed a bank, kidnapped three of its employees, and killed one of them. ''The next morning a moving picture film with a sound track was made of an 'interview' in the jail between Rideau and the Sheriff of Calcasieu Parish. This 'interview' lasted approximately 20 minutes. It consisted of interrogation by the sheriff and admissions by Rideau that he had perpetrated the bank robbery, kidnapping, and murder.'' (10 L.Ed.2d at p. 664.) The film was broadcast later that day and on each of the next two days over a local television station. When Rideau was arraigned two weeks later, his counsel moved for a change of venue on the ground that he would be deprived of his constitutional rights if he were forced to trial in Calcasieu Parish after the three broadcasts. The motion was denied and Rideau was convicted. Reversing the conviction, the court held that it was a denial of due process of law to refuse the request for a change of venue.[8]

It is clear from these and many similar cases that it cannot be laid down as a general rule that pretrial publicity of a prejudicial nature invariably deprives *all* defendants of their constitutional right to a fair trial before an impartial jury. It is equally clear that the burden rests on each defendant to

---

[8] Cf. *People* v. *Massie,* 66 Cal.2d 899, 909 [6] [59 Cal.Rptr. 733, 428 P.2d 869]: ''Massie contends that the trial court committed reversible error in admitting into evidence a sound news film, taken at the police station after Massie's second confession, depicting Massie admitting his guilt in an interview with a reporter. . . . *Price* [63 Cal.2d 370 (46 Cal.Rptr. 775, 406 P.2d 55)] controls the present case. Police had already obtained Massie's confession after he had been advised of his constitutional rights. Massie consented to, and did fully, participate in the interview; he adduced no evidence of compulsion or of police complicity in staging it. Massie asks that we reexamine the principle enunciated in *Price* in light of *Sheppard* v. *Maxwell* (1966) 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507], and *Estes* v. *Texas* (1965) 381 U.S. 532 [14 L.Ed.2d 543, 85 S.Ct. 1628], as well as *Rideau* v. *Louisiana* (1963) 373 U.S. 723 [10 L.Ed.2d 663, 83 S.Ct. 1417]. In those cases, however, the effect of the publicity generated by television and other news media deprived the defendants of an impartial jury and a fair trial. Massie submits no contention that publicity of his confession was so pervasive in Los Angeles County as would have rendered selection of an impartial jury impossible.''

establish affirmatively that he has been deprived of that right by such publicity.

Plaintiff contends that all this has now been changed by *Sheppard* v. *Maxwell*, 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507]. We do not believe that this is so.

### *Sheppard* v. *Maxwell*

Plaintiff says that it was not until *Sheppard* that the way seemed clear for a proper treatment and resolution of the issue, and that the proposed injunction carries out the directive of the court.

In our opinion the impact of the decision in *Sheppard* on the case before us is much more limited than plaintiff suggests. The question there before the court was whether Sheppard had been deprived of a fair trial in his state conviction for second degree murder of his wife because of the trial judge's failure to protect him "from the massive, pervasive and prejudicial publicity that attended his prosecution." Although the court reviewed in some detail the publicity given to the case from the discovery of the death to the conclusion of the trial, it is evident from its opinion that it was concerned primarily with the failure of the trial judge to "fulfill his duty to protect Sheppard from the inherently prejudicial publicity which saturated the community and to control disruptive influences in the court room . . ." (384 U.S. at p. 363, 16 L.Ed.2d at p. 621.) The court "concluded that Sheppard did not receive a fair trial consistent with the Due Process Clause of the Fourteenth Amendment" (384 U.S. at p. 335, 16 L.Ed.2d at p. 605), and remanded the case to the trial court with directions to issue a writ of habeas corpus.

The significance of *Sheppard* here lies in the fact that "While the *Sheppard* court discussed pretrial publicity at length, it explicitly declined to hold that such publicity in itself worked a denial of due process." (*People* v. *Modesto*, 66 Cal.2d 695, 705-706, fn. 2 [59 Cal.Rptr. 124, 427 P.2d 788].)[9] In *Sheppard* the pretrial publicity was only a part of

---

[9]*Modesto* was a first degree murder case. The murders were committed in 1961. The judgment of conviction at the first trial was reversed in 1963. (*People* v. *Modesto*, 59 Cal.2d 722 [31 Cal.Rptr. 225, 382 P.2d 33].) On appeal from the judgment of conviction, at the second trial defendant contends that the trial court erred in denying his motion for a change of venue on the ground that he could not obtain a fair and impartial trial in Riverside County. (*People* v. *Modesto*, 62 Cal.2d 436, 442 [42 Cal.Rptr. 417, 398 P.2d 753].) "He supported his motion with affidavits setting forth the extensive newspaper coverage of his first trial

the background of the case. "While we cannot say that Sheppard was denied due process by the judge's refusal to take precautions against the influence of pretrial publicity alone, the court's later rulings must be considered against the setting in which the trial was held. In light of this background, we believe that the arrangements made by the judge with the news media caused Sheppard to be deprived of that 'judicial serenity and calm to which [he] was entitled.' *Estes* v. *Texas, supra,* 381 U.S. at p. 536, 14 L.Ed.2d at p. 546." (384 U.S. at pp. 354-355, 16 L.Ed.2d at p. 616.)

So here we cannot say that it is necessary to silence the sources of pretrial publicity during the prearraignment period in order to protect the right of every defendant to a fair trial by an impartial jury. Nor can we say that the unrestricted release of information by the district attorney or by the sheriff or any other peace officer during that period about any person under arrest, standing alone, will *always* result in a denial of constitutional due process to any such person and that all such conduct is therefore illegal.

Perhaps it should be added as a footnote to the foregoing discussion that in *Rubenstein* v. *State* (Tex.Crim.App.) 407 S.W.2d 793, it was held on the authority of *Estes* and *Shep-*

and this court's reversal of the judgment. He asserts that the prospective jurors must have been aware of his criminal record, including the fact that he was on parole from a judgment of conviction of second degree murder at the time of the present homicides; that he had confessed; and that the trial judge at the first trial had stated his agreement with the verdicts and later vigorously criticized the decision of this court reversing the judgment." The court held that the denial of the motion was not error (pp. 442-443). "The newspaper articles attached to defendant's affidavit were published from October 31, 1961, to July 17, 1963. The case was retried before a different trial judge, who denied defendant's motion to change venue without prejudice on September 10, 1963. The trial was commenced on October 14, 1963, and no difficulty was experienced in securing jurors who were not aware of the earlier publicity. Defendant did not exhaust his peremptory challenges, and he did not renew his motion to change venue. Under these circumstances the trial court did not abuse its discretion in denying defendant's motion without prejudice before trial and did not err in failing to raise the question on its own motion thereafter. It could reasonably conclude that defendant could secure a fair trial in Riverside County. (See *People* v. *Duncan,* 53 Cal.2d 803, 812 [3 Cal.Rptr. 351, 350 P.2d 103]; cf. *Irvin* v. *Dowd,* 366 U.S. 717, 720, 726-727 [6 L.Ed.2d 751, 754, 758-759, 81 S.Ct. 1639]; *People* v. *McKay,* 37 Cal.2d 792, 800 [236 P.2d 145].)" On appeal from the judgment of conviction at the third trial, the court held that pursuant to the doctrine of the law of the case defendant could not relitigate the issue unless some intervening decision had altered or clarified the applicable legal principles, and that *Estes* v. *Texas,* 381 U.S. 532 [14 L.Ed.2d 543, 85 S.Ct. 1628], and *Sheppard* v. *Maxwell,* 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507], "do not affect the ruling here." (66 Cal.2d at pp. 705, 706, fn. 2.)

*pard* that the trial court erred in denying defendant's motion for a change of venue from Dallas County.

As we have noted above, plaintiff also contends that the proposed injunction would simply carry out the directive of the court in *Sheppard* v. *Maxwell.* In support of that contention plaintiff directs our attention to the concluding paragraph of the court's discussion of the problem where the court said: ''From the cases coming here we note that unfair and prejudicial news comment on pending trials has become increasingly prevalent. . . . Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused. . . . But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences.'' (384 U.S. at pp. 362, 363, 16 L.Ed.2d at p. 620.)

In our opinion plaintiff misjudges the scope of the court's admonition. Just a year before *Sheppard* the same court said in *Estes* v. *Texas,* 381 U.S. at p. 544, 14 L.Ed.2d at p. 551: ''In *Rideau, Irvin* and *Stroble,* the pretrial publicity occurred outside the courtroom and could not be effectively curtailed. The only recourse other than reversal was by contempt proceeding.'' Although *Sheppard* appears to suggest possible remedies other than by contempt, we cannot read *Sheppard* as now holding that potentially prejudicial pretrial publicity which occurs outside the courtroom can be controlled by injunction.

The opinion in Sheppard shows that the court does no more than urge control of prejudicial pretrial publicity by the adoption and enforcement of appropriate rules and regulations. Thus, the court suggested that the making of statements by any attorney appearing in a criminal case should be prohibited by appropriate rules of court governing the professonal conduct of attorney, as was done in *State* v. *Van Duyne,* 43 N.J. 369, 389 [204 A.2d 841, 850, 11 A.L.R.3d 1086], by its interpretation of Canon 20 of the American Bar Association Canons of Professional Ethics.[10] At the same

---

[10] In New Jersey the Canons of Professional Ethics of the American Bar Association have been adopted by rule of court and are binding on all attorneys practicing law in that state. (New Jersey Supreme Court Rules, rule 1:25.)

time the court recognized that the courts have no direct control over the dissemination of potentially prejudicial information by law enforcement officers and said that such control should be exercised by the appropriate city and county officials.[11]

In *State* v. *Van Duyne, supra,* the court said that the news accounts which appeared at the time the jury was being drawn "suggest that the inflammatory factual material (which was never proved at the trial) was furnished by the police. If true, such conduct is censurable and worthy of discipline. Control of the matter is largely in the hands of the prosecutor and local police authorities." (204 A.2d at p. 852.) The court also held Canons 5 and 20 of the Canons of Professional Ethics "require a broader and more stringent rule. We interpret these canons particularly Canon 20, to ban statements to news media by prosecutors, assistant prosecutors and their lawyer staff members, as to alleged confessions or inculpatory admissions by the accused, or to the effect that the case is 'open and shut' against the defendant, and the like, or with reference to the defendant's prior criminal record, either of convictions or arrests. Such statements have the capacity to interfere with a fair trial and cannot be countenanced. With respect to prosecutors' detectives and members of local police departments who are not members of the bar, statements of the type described are an improper interference with the due administration of criminal justice and constitute conduct unbecoming a police officer. As such they warrant discipline at the hands of the proper authorities. The ban on statements by the prosecutor and his aides applies as well to defense counsel." (*State* v. *Van Duyne,* 43 N.J. at pp. 388-389 [204 A.2d at p. 852, 11 A.L.R.3d at p. 1102].)[12]

*State* v. *Thompson,* 273 Minn. 1 [139 N.W.2d 490, 514], was decided several months before *Sheppard.* After remarking that no way had yet been found "to strike a fair balance between the constitutional guaranty of a free press and the

[11]"Being advised of the great public interest in the case, the mass coverage of the press, and the potential prejudicial impact of publicity, the court could also have requested the appropriate city and county officials to promulgate a regulation with respect to dissemination of information about the case by their employees." (384 U.S. at pp. 361-362, 16 L.Ed.2d at p. 620.)

[12]*State* v. *Van Duyne* as reported in 11 A.L.R.3d 1086 is followed by an annotation in 11 A.L.R.3d at 1104, on Release of Information Concerning Forthcoming or Pending Trial as Ground for Contempt Proceedings or Other Disciplinary Measures Against Member of the Bar.

constitutional right to a fair trial,'' and that ''[t]he only safeguard now in existence is the self-restraint of news media,'' the court said that it agreed with the conclusion in *Van Duyne, supra,* ''that attorneys, both prosecution and defense, who publicly discuss the case and are quoted in the news media, particularly with respect to expressions of opinion as to guilt or innocence of the defendant, ought to be dealt with promptly by the court. Police officers, over whom we have no such disciplinary power, ought likewise to be dealt with by their superior officers to the end that criminal cases may be fairly tried in court and not in the news media.

Our interpretation of *Sheppard* finds substantial support in the recent reports of what are generally known as the Reardon Committee and the Medina Committee, each composed of several distinguished judges and lawyers.[13]

Both the Reardon Committee and the Medina Committee agree that the release of potentially prejudicial information by lawyers should be controlled by the adoption and enforcement of canons or rules of professional conduct dealing specifically with the problem of pretrial discussion of pending or imminent criminal cases. (Reardon, Rev. Tent. Draft, pp. 1-4; Medina Report, pp. 14-26.)[14] Both committees also agree that effective measures to control the release of such information by law enforcement officers can and should only come through the adoption and enforcement of appropriate regula-

---

[13]Standards Relating to Fair Trial and Free Press, Tentative Draft, Institute of Judicial Administration, December 1966, recommended by the Advisory Committee on Fair Trial and Free Press, Hon. Paul C. Reardon, Associate Justice, Supreme Judicial Court of Massachusetts, as a part of American Bar Association Project on Minimum Standards for Criminal Justice. See also Revision of Tentative Draft, July 1967.

Freedom of the Press and Fair Trial, Final Report with Recommendations, by the Special Committee on Radio, Television, and the Administration of Justice of The Association of the Bar of the City of New York, Judge Harold R. Medina, Chairman, 1967, Columbia University Press.

[14]In California, ''With the approval of the Supreme Court the Board of Governors [of the State Bar] may formulate and enforce rules of professional conduct for all members of the bar in the State.'' (Bus. & Prof. Code, § 6076.) The power to ''adopt rules for court administration, practice and procedure, not inconsistent with statute,'' is vested in the Judicial Council. (Const., art. VI, § 6.) A superior court ''may make rules for its own government and the government of its officers not inconsistent with law or with the rules adopted and prescribed by the Judicial Council.'' (Gov. Code, § 68070.) In this proceeding the extent to which the problem under discussion can be solved by the adoption of a rule of court is not before us. We are satisfied, however, that a judge of the superior court, acting alone, is not empowered to adopt any such rule of general application.

tions by such agencies. (Reardon, Rev. Tent. Draft, pp. 4-6; Medina Report, pp. 27-35.)

The Reardon Committee did not consider the precise issue before us. The report of the Medina Committee meets it head on by directing itself to the question: During the pretrial period should the courts and the judges impose controls on the police, the lawyers, and the press? We can do no better than adopt the Committee's answer to that question as our own.

As usual, says the Medina Committee, ''there is, on the one hand, the question of power or jurisdiction and, on the other hand, the question of policy. Moreover, one cannot consider the two questions *in vacuo*. They must be discussed in relation to the groups of persons who would be affected by the control of prejudicial publicity. Thus, starting with the commission of the crime or the arrest of the accused or the filing of the indictment or information and continuing up to the time of the commencement of the trial or thereabouts, it is a serious question, both of power and of policy, whether the court in which the case is to be tried, or any court, should, by rule of court, by authority of legislative enactment, or by virtue of some competence supposed to be inherent in the judicial function, have the right, vis-à-vis lawyers, members of the police force, or representatives of the press, to proscribe the publication or utterance of matter deemed prejudicial to the right of the accused to a fair trial. If such right exists, either actually or *in ovo,* then the judges, in this pretrial period, must have the power to fine and imprison as for contempt of court all lawyers, members of the police force, and representatives of the press who violate the orders or rules of proscription. The prospect, in this pretrial period, of judges of various criminal courts of high and low degree sitting as petty tyrants, handing down sentences of fine and imprisonment for contempt of court against lawyers, policemen, and reporters and editors, is not attractive. Such an innovation might well cut prejudicial publicity to a minimum. But at what a price!

''Initially a distinction must be drawn within the word 'pretrial' between the purely investigatory stage before any judicial proceeding has been instituted and the second stage which begins when the defendant is brought before a commissioner or magistrate or when a grand jury proceeding has commenced. The Committee is firmly of the opinion that the courts lack any power whatsoever over the police or the news media during the first stage of the pretrial period, except the

ever-present power to control activities in and around the courthouse.

"During the second stage, the authority of the court increases to encompass those judicial or quasi-judicial proceedings. . . . Nevertheless, with respect to the police and the press in the entire pretrial period we think it unwise and detrimental to the public interest to give such contempt powers to the courts and the judges. Moreover, we think that such proceedings and the court rules, legislation or what not else authorizing such contempt proceedings might well be held to be a violation of the First Amendment guarantees of free press and free speech. Furthermore, as to the police, we find no authority inherent in the courts or the judges to discipline them for alleged breach of their duties as police officers." (Medina Report, pp. 39-40.)

Having concluded for the reasons discussed in this opinion that respondent court does not have the power to issue the proposed injunction, we find it unnecessary to discuss the contention of defendants and of amici curiae that in the absence of a showing of some clear and present danger to the rights of the accused *in every case,* the proposed injunction would unconstitutionally abridge freedom of speech or freedom of the press. It is enough to note that in *Baltimore Radio Show* v. *State,* 193 Md. 300 [67 A.2d 497], it was held that the result here sought by plaintiff could not be accomplished by a rule of the trial court by reason of the First and Fourteenth Amendments.[15] The Supreme Court denied certiorari in *Maryland* v. *Baltimore Radio Show,* 338 U.S. 912 [94 L.Ed. 562, 70 S.Ct. 252].

Let a writ of prohibition issue requiring the respondent court to refrain from issuing the injunction delineated in paragraph VII of its minute order of February 24, 1967, in the case of Monroe v. City of Los Angeles, et al., action number

---

[15]The case cited involved a rule adopted by the Criminal Court of Baltimore, since repealed, which provided in part (67 A.L.R.2d at 505): "In connection with any case which may be pending in the Criminal Court of Baltimore, or in connection with any person charged with a crime and in the custody of the Police Department of Baltimore City, or other constituted authorities, upon a charge of crime over which the Criminal Court of Baltimore has jurisdiction, whether before or after indictment, any of the following acts shall be subject to punishment as contempt. . . .

"(C) The issuance by police authorities, the State's Attorney, counsel for the defense, or any other person having official connection with the case, of any statement relative to the conduct of the accused, statements or admissions made by the accused, or other matters bearing upon the issues to be tried." (See Final Report of Medina Committee, p. 41.)

892044, and to refrain from any further proceedings therein other than to enter an order dismissing said action.

Ford, P. J., and Cobey, J., concurred.

The petition of the real party in interest for a hearing by the Supreme Court was denied October 11, 1967. Peters, J., and Mosk, J., were of the opinion that the petition should be granted.